**Luis TRIANA, Plaintiff–Appellant,**

v.

**UNITED STATES of America, Defendant–Appellee.**

**No. 1861, Docket No. 98–2952**

United States Court of Appeals, Second Circuit.

Argued Sept. 2, 1999

Decided Feb. 24, 2000

Darrell B. Fields, New York, N.Y. (Legal Aid Society, Federal Defender Division, Appeals Bureau, on the brief), for Plaintiff–Appellant.

Emily Berger, Brooklyn, N.Y. (Zachary W. Carter, United States Attorney for the Eastern District of New York, Paul Schoeman, Assistant United States Attorney, on the brief), for Defendant–Appellee.

Before: JACOBS, McLAUGHLIN, and PARKER, Circuit Judges.

JACOBS, Circuit Judge:

Luis Triana, who was convicted in federal court for offenses arising out of a scheme to import cocaine, appeals from an order of the United States District Court for the Eastern District of New York (Korman, *J.*) denying his motion to vacate his conviction. Triana contends that his Sixth Amendment right to counsel was

violated because both his lawyers had conflicts of interest:

(i) As to lawyer Luis Beltre, it is apparently undisputed that he was a participant in the same cocaine importation scheme from which Triana's charges arose.

(ii) As to Jerald Levine, Esq., who has testified that he does not know who paid his fees for Triana's defense, Triana argues that (a) Levine's disclaimer as to the source of his fee is inherently implausible, (b) Levine therefore also must have had a divided loyalty, and (c) this conflict of interest adversely affected Triana's defense.

It is undisputed that the trial was conducted almost entirely by Levine, and that Beltre's services at trial were negligible. We affirm, because, (i) as to Levine, who actively conducted Triana's defense, the evidence does not support the allegation that he had a conflict, and (ii) as to Beltre, although he had an actual conflict of interest, he had no more than a negligible role at trial. In short, Levine labored under no conflict, and Beltre had a conflict but labored not.

## BACKGROUND

### A. The Conviction

During 1989, Triana held himself out as the president of Arenal, Inc., a firm with locations in Philadelphia, Pennsylvania, and Long Island City, New York, that was ostensibly in the business of importing sodium hydroxide, known as "caustic soda." In fact, Arenal was a front for cocaine importation. The organization concealed cocaine in the bottom of drums filled with caustic soda, imported the drums to the United States through Philadelphia, and then shipped them by truck to New York. On November 4, 1989, United States Customs Agents searched the Arenal warehouse in New York and seized five tons of cocaine.

Triana was charged with conspiracy to import cocaine, in violation of 21 U.S.C. §§ 952(a), 963 (1988); conspiracy to possess cocaine with intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1), 846 (1988); and possession of cocaine with intent to distribute, 21 U.S.C. § 841(a)(1) (1988).

At the jury trial before Judge Korman in the Eastern District of New York, Levine and Beltre both appeared for Triana. The thrust of Triana's defense was that he was a legitimate businessman associated with a number of enterprises, and he did not know that Arenal was being used as a front for the importation of illegal drugs.

The government presented evidence that Triana was the president of Arenal (as well as another front corporation) and that he arranged for the purchase by Arenal of a suction machine that was capable of removing the surrounding caustic soda from the drum so that the conspirators could isolate and remove the cocaine. For reasons that are disputed on the present appeal, Triana did not testify in his defense. He was convicted on August 7, 1991, and his conviction was affirmed without opinion on direct appeal to this Court. *See United States v. Lopez*, 993 F.2d 1534 (2d Cir. 1993) (unpublished table decision). On September 24, 1992, Triana was sentenced to three concurrent terms of 292 months' imprisonment followed by five years of supervised release, a sentence that was later reduced.

### B. The Habeas Proceeding

On July 19, 1994, Triana, *pro se* and incarcerated, filed a motion to vacate his conviction pursuant to 28 U.S.C. § 2255, claiming that conflicts of interest on the part of his trial counsel rendered their assistance constitutionally ineffective, and (in particular) nullified his right to testify in his own defense. Counsel appointed by Judge Korman prevailed on a motion for resentencing, upon which Triana's sentence was reduced (on February 9, 1996) to 168 months in prison and five years of supervision. On June 10, 1996, Judge

Korman referred the habeas proceeding to Magistrate Judge A. Simon Chrein for preparation of a report and recommendation on the conflict of interest issues. The magistrate judge conducted a three-day evidentiary hearing early in 1997.

The facts stated here are drawn from the testimony at the hearing, as found by the magistrate judge, or are essentially undisputed.

Triana originally tried to retain Barry Schulman, Esq. Schulman, who was representing another defendant in the same action, may have recommended Levine to Marta Parra, a friend of Triana's. Levine testified that he initially learned of Triana and his arrest in a phone call from Parra, whom he knew from a prior retention. In any event, Levine appeared on Triana's behalf at the arraignment, and informed Triana "I'm your lawyer." Later, in a meeting with Triana at the Metropolitan Correctional Center ("MCC"), Levine quoted a fee of $80,000. Triana said he could not afford to pay it, but told Levine to see if any of Triana's friends could help pay the fee.

To this end, Levine talked to Parra several times. At one point, Levine dialed a phone number in Colombia and spoke to a party who said that "they were helping Mr. Triana out on the case." Levine asked that $50,000 be wired to his bank account to start the defense, and the money arrived shortly thereafter. Levine was unable to recall the name of the person with whom he spoke or how he had gotten the phone number. Nor does he know who sent the money, except that the money was not given to him by Beltre. Levine emphasized, however, that he "did not discuss the case or how he should defend the case with the unknown payor." The Colombian phone number was later disconnected, and the $30,000 balance of Levine's fee was never paid.

Levine assumed that the unknown source of funds was a close friend of Triana's, one Luis Delio Lopez. Levine believed that Lopez was the head of the Colombian organization that supplied Arenal with narcotics, and thus Triana's ultimate employer. Triana testified that he too assumed that Lopez was the source of the money.

Beltre's appearance is more mysterious. Beltre first materialized several days after the arraignment in a meeting at the MCC, during which he assured Triana that he "was in charge of paying the lawyers' fees." According to DEA Special Agent Peter Reilly, Beltre appeared as Triana's counsel at the behest of Ramon Velasquez, who allegedly headed the narcotics distribution organization that employed Triana directly. Beltre's usual employment for Velasquez was money-laundering, but his role in Triana's defense was to protect Velasquez's interests by monitoring the evidence for any risk to Velasquez. Triana testified that he learned from government agents during a proffer session that Velasquez and his brother provided half the financing for the five-ton cocaine shipment and that Velasquez's half-brother set up Arenal's New York operation.

Levine testified that Beltre entered the case after Levine, that he did not know how Beltre was retained, and that he never enlisted Beltre to contact Triana's benefactors about the unpaid $30,000 balance owing to Levine.

In 1992, Beltre was indicted, along with Velasquez and others, in the Eastern District of New York on charges related to cocaine importation. Beltre was murdered two days after Velasquez's lawyer was advised that Beltre was cooperating with the government.

After the hearing, the magistrate judge issued his report and recommendation, which accurately recited the applicable principles of law, and concluded:

(i) that, although Levine may have been paid by some party (known or unknown) who had in mind some interests other than Triana's, Triana failed to make the requisite showing that Levine's interests diverged from Triana's

as to a material factual or legal issue or a course of action; and

(ii) that Beltre "had no influence over Levine's decision to counsel Triana not to testify," and that "there [was] no evidence that Beltre had any input into the strategic decisions made during the defense of Triana's criminal case."

The magistrate judge therefore recommended that the § 2255 motion be denied. Judge Korman adopted the Report and Recommendation on October 20, 1998.

On this appeal, Triana makes two claims of error bearing on his Sixth Amendment right to counsel. First, Triana claims that Levine labored under a conflict of interest that adversely affected his representation of Triana, as manifested by Levine's desire to keep Triana from testifying in his own defense. Second, Triana asserts that Beltre's membership in the Velasquez conspiracy was a conflict of interest that constituted a *per se* violation of Triana's right to counsel, and requires automatic reversal of the conviction.

## DISCUSSION

This Court has jurisdiction pursuant to 28 U.S.C. §§ 1291 and 2255. The notice of appeal was timely filed on October 22, 1998, soon after denial of the motion.

■ In the § 2255 context, this Court reviews "factual findings for clear error" and "questions of law *de novo*." *Scanio v. United States*, 37 F.3d 858, 859 (2d Cir. 1994). "The question of whether a defendant's lawyer's representation violates the Sixth Amendment right to effective assistance of counsel is a mixed question of law and fact that is reviewed *de novo*." *United States v. Blau*, 159 F.3d 68, 74 (2d Cir.1998).

■ The touchstone of any Sixth Amendment claim is whether circumstances suggest "a breakdown in the adversarial process that our system counts on to produce just results." *Tippins v. Walker*, 77 F.3d 682, 685 (2d Cir.1996) (quoting *Strickland v. Washington*, 466

U.S. 668, 696, 104 S.Ct. 2052, 2069, 80 L.Ed.2d 674 (1984)) (internal quotation marks omitted). The burden of proof rested on Triana to show a conflict of interest by a preponderance of the evidence. *See Harned v. Henderson*, 588 F.2d 12, 22 (2d Cir.1978) (§ 2255 proceeding).

### A. Levine

■ The harm of Levine's alleged conflict, according to Triana, was that it influenced Levine to keep Triana off the witness stand. Triana represents that his testimony at trial would have drawn attention to Velasquez, and argues that Levine, acting on the alleged conflict, prevented Triana from testifying in order to protect Velasquez. In particular, Triana says that at trial, he would have disclaimed knowledge of the cocaine or of Arenal's status as a front for drug importation, would have explained his ignorance on the basis that he was no more than a freelance salesman for Arenal, and would have accounted for his otherwise inexplicable income (evidenced by tax returns put in evidence by the government) by testifying that his primary business was PLT Enterprises, a seller of toys, furniture and gloves, that had as its main customer a company—La Moderna—which was owned by Velasquez. This explanation would presumably have been reinforced by government agents who reported seeing Triana unloading furniture at La Moderna. Triana argues that it was in Velasquez's interest to keep Triana off the stand, and thereby to keep Velasquez out of the case.

■ Triana thus alleges that Levine had an actual conflict of interest that adversely affected his performance as counsel, in violation of the standard set out in *Cuyler v. Sullivan*, 446 U.S. 335, 348–49, 100 S.Ct. 1708, 1718–19, 64 L.Ed.2d 333 (1980). Such an adverse effect is demonstrated only where the defendant (here, the petitioner) shows that counsel's interests diverged from the defendant's on some material legal or factual issue and resulted in

an "actual lapse in representation." *Id.;* *see also United States v. O'Neil,* 118 F.3d 65, 71 (2d Cir.1997); *United States v. Stantini,* 85 F.3d 9, 16 (2d Cir.1996); *United States v. Iorizzo,* 786 F.2d 52, 58 (2d Cir.1986). Such a lapse of representation occurs when counsel, acting under a divided loyalty, forgoes some plausible alternative strategy of defense. *See Winkler v. Keane,* 7 F.3d 304, 309 (2d Cir.1993); *Stantini,* 85 F.3d at 16. However, the burden of proof cannot be met by speculative assertions of bias or prejudice. *See Cuyler,* 446 U.S. at 350, 100 S.Ct. at 1719; *Strouse v. Leonardo,* 928 F.2d 548, 552 (2d Cir.1991); *United States v. Jones,* 900 F.2d 512, 519 (2d Cir.1990).

Levine testified that he told Triana of his right to testify, but advised him against doing so. As Levine recalls, he had two reasons for the advice he gave. First, he thought that the most effective way to depict Triana as a legitimate businessman was through other available evidence, in particular, through effective cross-examination of the government's witnesses. Second and more importantly, Triana failed, despite diligent preparation, to deal with the tough questions that Levine anticipated would be asked on cross-examination.

As the magistrate judge summarized this evidence:

> Triana testified at the [evidentiary] hearing that in the year between his arrest and his criminal trial, he asked Levine about testifying. Levine told him that it was not necessary for him to testify; that Levine "wasn't going to spend any two weeks putting [Triana] on the stand;" and that Triana "didn't have to speak, that he was my lawyer and that he would speak for me." Although he did not demand to testify, Triana alleged that Levine never told him that he had an absolute right to testify if he wanted to testify.

(second alteration in original; citation omitted).

For several reasons, we agree with the conclusion, reached by the magistrate judge and the district judge, that Triana failed to demonstrate a divergence between his interests and those of Levine on any factual matter, legal issue, or course of action.

1. The risks of Triana's testimony were sufficiently clear and palpable that Levine's advice in itself can support no inference of divided loyalty. The magistrate judge

> credit[ed] Levine's testimony that he advised the petitioner of his right to testify and that at first petitioner insisted on testifying, but was later persuaded that he ought not to because of his vulnerability on cross examination[,] including his interest in the warehouse, his lack of knowledge of the caustic soda business, and his participation in certain questionable transactions.

(footnote omitted). When Triana did testify on these topics in support of his motion for habeas relief, the district court called the testimony "just totally ludicrous and far-fetched." The magistrate judge concluded: "I am persuaded that Triana made an intelligent, tactical choice not to testify. Therefore, I find that petitioner's constitutional right to testify was not violated at his criminal trial." Thus there was no "lapse in representation," *Cuyler,* 446 U.S. at 349, 100 S.Ct. at 1719, or "adverse effect," *United States v. Levy,* 25 F.3d 146, 157 (2d Cir.1994), to warrant relief.

2. There is no basis for thinking that Levine's advice was infected by Beltre's conflict of interest. The magistrate judge found that Beltre "had no influence over Levine's decision to counsel Triana not to testify." Even more categorically, the magistrate judge found that "there is no evidence that Beltre had any input into the strategic decisions made during the defense." Triana presents no evidence on this appeal to undermine that determination.

3. There is no record evidence that Levine knew who was paying his fee, or

that he discussed tactics or strategy with the voice on the other end of his call to Colombia, let alone that he received (or acted) on advice or instructions from that quarter. Triana argues that Levine's account is inherently unbelievable. We disagree.

Levine testified that he had no knowledge of Velasquez at the time of the trial, and the magistrate judge credited that testimony. There is little reason for any continuing interest by Levine in the source of funds for Triana's defense once the $50,000 was credited to Levine's account— assuming (as one may) that Levine was content as a business matter to forgo the $30,000 balance. Moreover, the third-party funding of Triana's defense is, as the magistrate judge found, a job benefit consistent with the informal employment terms of drug conspirators. Triana fails to adduce evidence that Levine had any actual conflict of interest, a prerequisite for relief under this theory. *See United States v. O'Neil,* 118 F.3d 65, 71 (2d Cir. 1997) ("[T]he defendant must establish *an actual conflict of interest* that resulted in a lapse of representation." (emphasis added; internal quotation marks omitted)). Speculation is not enough. *See Cuyler,* 446 U.S. at 350, 100 S.Ct. at 1719 ("[U]ntil a defendant shows that his counsel actively represented conflicting interests, he has not established the constitutional predicate for his claim of ineffective assistance.").

**B. Beltre**

■ For a very limited set of Sixth Amendment violations, prejudice is so likely that case-by-case analysis is inefficient and the infringement is presumed to constitute prejudice *per se. See Strickland,* 466 U.S. at 692, 104 S.Ct. at 2067; *United States v. Cronic,* 466 U.S. 648, 658–59, 104 S.Ct. 2039, 2046–47, 80 L.Ed.2d 657 (1984). One subset of this group are cases in which defense lawyers have egregious, realized conflicts of interest due to their own criminal activities. *See United States v. Cancilla,* 725 F.2d 867, 870 (2d Cir.1984);

*cf. United States v. Aiello,* 900 F.2d 528, 531 (2d Cir.1990) (limiting this subset). It is well-settled that the right to counsel is violated *per se* "where the attorney was implicated in the defendant's crime." *O'Neil,* 118 F.3d at 71; *see also Cancilla,* 725 F.2d at 870. This Court applies the *per se* rule when the attorney's alleged criminality is "sufficiently related to the charged crimes to create a real possibility that the attorney's vigorous defense of his client will be compromised." *United States v. Fulton,* 5 F.3d 605, 611 (2d Cir. 1993). Such a breach is generally presumed to result from counsel's fear that vigorous advocacy will result in the discovery of his own criminal endeavors. *See Cancilla,* 725 F.2d at 870.

■ Although Beltre was murdered before his conviction or acquittal, the record sufficiently demonstrates that he was a criminal employed by Velasquez in the drug-smuggling conspiracy of which Triana was convicted. Beltre is therefore presumed to have had a conflict of interest, to say the least. At the same time, the indispensable premise of Triana's appeal is that the assistance of counsel he actually received was *per se* ineffective. The magistrate judge determined that, because Beltre had no input into trial strategy, his participation does not require *per se* reversal. We agree.

If Beltre had been Triana's only lawyer, it would be easy to say that assistance of counsel in the case was ineffective *per se.* Necessarily, Triana's argument is that the same rule applies in the same way when the conflicted lawyer sits in the second chair. But as this case illustrates, the *per se* rule rests on an implicit—and here nonviable—assumption that the conflicted lawyer performed (or failed to perform) services as counsel, and participated in the conduct of the defense to an extent and in such a way that the conflict could have mattered. *See Fulton,* 5 F.3d at 610–11 (describing the danger of having a co-conspirator as counsel as the possibility that the "attorney's vigorous defense of his

client will be compromised"); *Cancilla*, 725 F.2d at 870 ("It is difficult to see how counsel conflicted in this way could impartially have given [the defendant] advice. . . ."). Where that assumption is wrong as a matter of fact, the reason for the *per se* rule disappears; thus the rule "should not be applied . . . in situations where the generalization [justifying the rule] is incorrect as an empirical matter." *Bellamy v. Cogdell*, 974 F.2d 302, 308 (2d Cir.1992) (in banc) (quoting *Coleman v. Thompson*, 501 U.S. 722, 737, 111 S.Ct. 2546, 2558, 115 L.Ed.2d 640 (1991)) (first alteration in *Bellamy*; internal quotation marks omitted).

The *per se* rule on lawyer conflicts, like other presumptions, describes a natural and ordinary effect of its factual predicate. *See Coleman*, 501 U.S. at 737, 111 S.Ct. at 2558 ("The presumption, like all conclusive presumptions, is designed to avoid the costs of excessive inquiry where a *per se* rule will achieve the correct result in almost all cases. . . . [T]he justification for a conclusive presumption disappears when application of the presumption will not reach the correct result most of the time.").

Constitutional ineffectiveness of counsel (*per se* rule or no *per se* rule) presumes either the absence of counsel, or some insufficiency in the lawyer who performed (or failed when needed to perform) some duty in which effectiveness had a bearing on the outcome. For constitutional purposes, it may or may not matter, depending upon the facts and circumstances, that the second-chair lawyer was conflicted, or incompetent, or never admitted to the bar.

■ We hold that there is no *per se* violation of the right to counsel where the lawyer implicated in the crime is not the lawyer conducting the defense, and has done nothing that has bearing on the result. On the following record facts, we conclude that the services and responsibilities undertaken by Beltre do not justify application of the *per se* rule:

- Levine conducted the defense without Beltre's assistance or input in any role that mattered to the outcome. Levine testified that he proceeded as though he was the sole lawyer acting in Triana's defense.
- Beltre did not retain or pay Levine.
- Beltre did not control the defense strategy or participate in it.
- Beltre did not deliver opening or closing arguments, argue motions, negotiate with the prosecution, prepare the defendant for testimony, or examine or cross-examine any witness whose testimony had bearing on the result.
- Beltre acted as a Spanish-language interpreter, and translated tapes of wiretapped conversations, and even as to that non-legal service, Triana does not allege that Beltre misled or prejudiced the defense.
- Beltre's only service as defense lawyer at trial was to conduct the cross-examination of one minor witness. It went badly, and after that Beltre was frequently absent. As conceded by Triana's counsel at oral argument, it is not claimed on appeal that Beltre's bungled cross-examination somehow affected the outcome of the trial or was prejudicial to Triana's interests.
- Otherwise, Levine did not know what Beltre was doing and did not ask.

It is despicable for a lawyer to appear in a case and serve as a spy for another interest, but where the lawyer functions as a spy and does not function as a lawyer in any work that bears on the outcome, application of the *per se* rule would be a legal fiction. It is theoretically possible that Beltre had a harmful influence on the defense, but on this record it is not shown. Application of the *per se* rule requires proof of the relevant circumstance, not speculation that it might be true. *See Aiello*, 900 F.2d at 532. Here there is no record evidence that Beltre's action or inaction compromised the "vigorous defense" mounted on Triana's behalf. *Fulton*, 5 F.3d at 611. Beltre was there for a while,

and at a point he left, and was evidently not missed because he was not needed or relied upon. In short, Beltre's participation did not result in "a breakdown in the adversarial process that our system counts on to produce just results." *Tippins v. Walker,* 77 F.3d 682, 685 (2d Cir. 1996) (quoting *Strickland,* 466 U.S. at 696, 104 S.Ct. at 2069) (internal quotation marks omitted).

## CONCLUSION

The order denying the motion to vacate Triana's conviction is affirmed.